**United States District Court**
For the Northern District of California

1
2
3
4      UNITED STATES DISTRICT COURT
5
6      NORTHERN DISTRICT OF CALIFORNIA
7

8    LENA M. RAMOS,

9              Plaintiff,                    No. C 08-1375 PJH

10        v.                                 **ORDER RE MOTIONS FOR**
                                             **SUMMARY JUDGMENT**
11   BANK OF AMERICA,

12              Defendant.
     _____/
13

14        The parties' motions for summary judgment came on for hearing before this court on

15   November 10, 2010.  Plaintiff appeared by her counsel Joseph Creitz, and defendants

16   appeared by their counsel Kristen Jacoby and Rebecca Hull.  Having read the parties'

17   papers and carefully considered their arguments and the relevant legal authority, and good

18   cause appearing, the court hereby GRANTS defendants' motion, and DENIES plaintiff's

19   motion.

20                              **BACKGROUND**

21        This is a case brought under the Employee Retirement Income Security Act of 1974,

22   29 U.S.C. § 1001, et seq. ("ERISA").  Plaintiff Lena Monzon Ramos is a former employee

23   of Bank of America ("BofA").  In November 2004, after 22 years with the bank, she left her

24   employment, claiming to be fully disabled and unable to perform any of the functions of her

25   job (Senior Operations Representative).

26        As set forth in the BofA Associate Handbook, BofA offers "illness, injury and

27   disability benefits" that include occasional illness days, short-term disability ("STD"), long-

28   term disability ("LTD"), worker's compensation for work-related injuries, and long-term care

United States District Court

For the Northern District of California

1    insurance.  Administrative Record ("AR") 0153.

2      In 2003, defendant Metropolitan Life Insurance Company ("MetLife") issued BofA a

3    group policy of insurance to fund long-term disability ("LTD") benefits payable under the

4    Bank of America Long Term Disability Benefits Plan ("2003 LTD Plan" or "the Plan").

5    Defendant Bank of America Corporation Corporate Benefits Committee ("BofA Program" or

6    "Program" – sued as "Bank of America") is the administrator of the 2003 LTD Plan.  MetLife

7    is an insurer, and is the entity to whom BofA Program delegated its duties as claims

8    administrator.

9      The Plan grants MetLife discretionary authority to make benefit decisions, as

10    follows:

11      In carrying out their respective responsibilities under the Plan, the Plan
     administrator and other Plan fiduciaries shall have discretionary authority to

12      interpret the terms of the Plan and to determine eligibility for and entitlement
     to Plan benefits in accordance with the terms of the Plan.  Any interpretation

13      or determination made pursuant to such discretionary authority shall be given
     full force and effect, unless it can be shown that the interpretation or

14      determination was arbitrary and capricious.

15    AR 0065.

16      To make a claim for benefits under the LTD Plan, "the claimant must complete the

17    appropriate claim form and submit the required proof."  AR 0064.  "Proof must describe . . .

18    the nature and the extent of the cause for which a claim is made; it must be satisfactory to

19    [MetLife]."  AR 0056.

20      Plan participants are eligible to receive LTD benefits, following a 180-day

21    Elimination Period, if they become "disabled" while covered under the Plan.  See AR 0045,

22    0051.

23      The Plan defines "disabled" as follows:

24      "Disability" or "Disabled" means that, due to an Injury or Sickness, you require
     the Appropriate Care and Treatment of a Doctor, unless, in the opinion of a

25      doctor, future or continued treatment would be of no benefit and:

26      1.     you are unable to perform each of the material duties of your
     occupation; and

27

28      2.     after the first 24 months of benefit payments, you must also be unable
     to perform each of the material duties of any gainful work or service for which

United States District Court

For the Northern District of California

you are reasonably qualified taking into consideration your training, education, experience, and past earnings; or

3.     you, while unable to perform all of the material duties of your own occupation on a full-time basis, are:

a.     performing at least one of the material duties of your own occupation or any other gainful work or service on a part-time or full-time basis; and

b.     earning currently at least 40% less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness.

AR 0050-0051.

The Plan sets forth procedures for making benefit claims with MetLife, including procedures for the submission and determination of claims, review of claims that have been denied in whole or in part, and information regarding a participant's rights under ERISA. AR 0056-0057, 0064-0067.

BofA employees receive sickness and Family and Medical Leave Act ("FMLA")[1] coverage through the STD Plan, which pays income replacement benefits for up to six months (depending on length of employment) to any employee who submits a request completed by the employee and his/her doctor, along with "medical documentation" of "illness, injury or pregnancy disability" sufficient to demonstrate that he/she was "unable to work" for more than 14 consecutive calendar days.  AR 0154-0155.

In November 2004, plaintiff applied for benefits under the STD Plan administered by BofA.  (MetLife took over administration of the STD Plan in March 2005.)  Plaintiff's claim was approved for the period beginning November 19, 2004, and was ultimately extended through June 2, 2005 – the longest period allowable under the provisions of the STD Plan.

In February 2005, MetLife informed plaintiff of her eligibility to apply for LTD benefits.  In a letter dated February 21, 2005, MetLife advised plaintiff that in order for her claim to be evaluated, she would have to provide an Attending Physician Statement of

---

[1]     Under the FMLA, an employer must approve a leave to an otherwise eligible employee, if the employee reports (and her doctor certifies) a "serious health condition," defined as "an illness, injury, impairment, or physical or mental condition that involves  – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).

United States District Court
For the Northern District of California

1   Functional Capacity ("APS"); an Employee Statement; contact information for all physicians

2   who had treated her for the allegedly disabling condition; an authorization to release

3   medical information; and information regarding training, education, experience, job

4   description, plus proof of age and a copy of her driver's license.  AR 0365.  MetLife

5   instructed plaintiff that in addition to the APS, her physician "should also include all office

6   notes and test results from [the] date of disability that support the stated diagnosis and

7   restrictions and limitations."  Id.

8          MetLife added that the above forms "must be completed and returned by March 21,

9   2005, to give your claim consideration and to minimize delay in benefit payments that may

10  be due," and that "[u]nless we receive these forms by March 21, 2005, we will assume you

11  are no longer interested in pursuing your claim for disability and will close your file."  AR

12  0365-0366.

13         Plaintiff submitted her application for LTD benefits in March 2005.  She listed her job

14  duties as performing data entry, typing, and receiving incoming wires.  AR 0352.  She

15  described her medical condition as shortness of breath, with constant coughing, with

16  symptoms that "feel like an asthma attack."  AR 0349.  She reported that her current

17  medications included albuterol, ferosemide, Singulair®, Advair®, Ecotrin®, Phenergan®,

18  Nexium®, and Relpax®.  AR 0353.

19         Plaintiff stated that the date of first treatment for her condition was 2003; that her last

20  day of work as an Operations Representative was November 15, 2004; and that the date

21  her disability began was November 19, 2004.  AR 0348.  She listed three physicians who

22  had treated her within the past two years – Dr. Melanie Lee, a specialist in internal

23  medicine; Dr. John Hadley, a specialist in pulmonology; Dr. Agustin Argenal, a specialist in

24  cardiology.  AR 0348-0349.

25         Based on the Plan's 180-day elimination period, plaintiff was not eligible for LTD

26  benefits unless she showed that she was disabled, and that she had been continuously

27  disabled throughout the period from November 15, 2004 to and including May 15, 2005.

28  See AR 0045, 0051.

4

United States District Court

For the Northern District of California

1    With her application, plaintiff submitted an APS from her pulmonologist, Dr. Hadley,

2  dated March 8, 2005.  See AR 0360-0362.  The APS provided the "latest reading" of

3  plaintiff's blood pressure, taken December 22, 2004.  AR 0361.  The APS stated that

4  plaintiff had been diagnosed with cardiac asthma and congestive heart failure, and reported

5  that plaintiff could not work due to "extreme asthma and coughing attacks" that left her

6  "unable to talk."  Id.

7    The APS also stated, however, that plaintiff could sit continuously for 8 hours, stand

8  intermittently for 1 hour, and walk intermittently for 1 hour.  While she had no ability to

9  climb, she could lift up to 20 pounds occasionally, and could twist/bend/stoop, reach above

10  shoulder level, and operate a motor vehicle.  She could also perform repetitive tasks with

11  both hands.  Id.

12    The APS indicated that the treatment plan for plaintiff's condition included referral to

13  a cardiologist, "nebulizer therapy," and a prescription for cough syrup; and stated that

14  improvement was "possible, if cough & asthma become controlled; cough medicine given."

15  Id.  The APS included the notation, "See records attached."  AR 0360.  However, no

16  records were attached or received by MetLife.  AR 0312.

17    According to MetLife's claim file notes, a MetLife case manager contacted Dr.

18  Hadley's office on March 15, 2005, regarding the missing records, and was told they were

19  in the possession of plaintiff.  Id.  A MetLife case manager then spoke with plaintiff, who

20  claimed she had sent the records to MetLife once, but that they had been returned to her.

21  She stated that she had sent them again on March 11 or 12, 2005.  AR 0313.  However,

22  according to MetLife, it never received the records.

23    Because of the lack of medical records supporting plaintiff's claim, MetLife denied

24  the claim in a letter dated March 23, 2005.  The letter stated that MetLife had reviewed the

25  information submitted by plaintiff – the Initial Claims Packet, and the APS signed by Dr.

26  Hadley on March 8, 2005 – but that certain information had not been received.  AR 0341-

27  0342.  Specifically, MetLife reminded plaintiff that she had previously been instructed to

28  provide "[a]ll office notes and test results from your date of disability that support the stated

5

United States District Court

For the Northern District of California

1   diagnosis and restrictions and limitations."  AR 0342.  MetLife added that "[o]nce the

2   requested medical information is received, your claim will be evaluated based on the

3   medical records provided."  Id.

4   The claim file notes of the same date reiterate that the February 21, 2005 letter to

5   plaintiff requested medical information by March 21, 2005; that plaintiff had provided the

6   APS, but that additional records were necessary to make the claim decision; that the claim

7   would be denied for lack of proof of disability; and that the medical (records) would be

8   reviewed upon receipt.  AR 0313.

9   MetLife's claim file notes reflect that plaintiff called MetLife on April 11, 2005,

10  requesting a call-back regarding the medical records needed.  She also stated that her last

11  appointment was in December 2004 and that her next appointment was April 29.  AR 0284.

12  A case manager returned plaintiff's call on April 12, 2005, and advised her to re-fax the

13  medical records to MetLife.  AR 0285.

14  On April 15, 2005, MetLife received a copy of Dr. Hadley's certification to the

15  California Employment Development Department ("EDD"), submitted in connection with

16  plaintiff's application for state disability benefits, dated February 25, 2005, stating that

17  plaintiff had congestive heart failure and cardiac asthma, causing her to experience

18  extreme shortness of breath and asthma attacks, and a chronic cough.  AR 0303.  Dr.

19  Hadley estimated that plaintiff would be able to return to work at some point in 2005.  (The

20  date is illegible.)  AR 0304.   He indicated that the date of last treatment was December 28,

21  2004; and that the date of the next appointment was April 29, 2005.  AR 0303.

22  On April 28, 2005, plaintiff called MetLife regarding her denied claim.  The case

23  manager advised plaintiff that the claim had been denied because the only medical

24  information MetLife had was an APS from Dr. Hadley, which had a note stating that

25  "records" were attached.  However, the case manager advised, MetLife did not receive any

26  records.  The claim file note states that plaintiff reported that she had gone for "testing" that

27  day, but it had to be stopped due to her breathing problems, and that she had an

28  appointment with Dr. Hadley the following day and would follow up on the missing

United States District Court
For the Northern District of California

1   information.  The note also indicates that plaintiff had coughed multiple times during the

2   telephone conversation.  AR 0288.

3          On May 5, 2005, MetLife received a Supplemental APS from Dr. Hadley, dated April

4   29, 2005, which was almost identical to the March 8, 2005, APS that MetLife had received

5   previously.  AR 0300-0302.  However, in this Supplemental APS, Dr. Hadley stated that he

6   had advised plaintiff to cease her usual occupation, adding that she had not been advised

7   to return to work, and that her condition was "permanent – until conditions & symptoms

8   improve." AR 0301.  Under "Subjective Symptoms" and "Objective Findings," Dr. Hadley

9   simply referred MetLife to "records previously sent" as supporting his diagnosis, AR 0300,

10   although MetLife asserts that no records had in fact been provided.

11         On May 18, 2005, plaintiff appealed the denial of her LTD claim.  On May 19, 2005,

12   MetLife received the following records:  (1) a Pulmonary Function Laboratory Report dated

13   June 10, 2004, which had been ordered by Dr. Lee; (2) an Echocardiogram Report dated

14   November 23, 2004, and signed by Dr. Argenal, noting "[m]inimal left atrial enlargement,"

15   "[e]vidence suggesting mitral valve repair with appearance of minimal stenosis and

16   thickened leaflets apparent," "[m]oderate aortic insufficiency," "[m]ild-to-moderate tricuspid

17   insufficiency," "no evidence of mitral insufficiency," "[p]ulmonary pressures are normal," and

18   "no diastolic disfunction;" (3) a single sheet of office visit notes regarding a December 22,

19   2004, cardiac consultation with Dr. Argenal, noting plaintiff's history of past mitral valve

20   issues, including the notation "mitral valve repair - appears O.K.," and setting an

21   appointment for a follow-up visit a year later, in December 2005; (4) a letter dated January

22   24, 2005 from Dr. Hadley, addressed "to whom it may concern," stating that plaintiff "may

23   qualify for permanent disability for her heart and lung condition," noting that "[s]he has been

24   diagnosed with Mitral Stenosis, Asthma, and Aortic Insufficiency," and that "[w]ith having

25   these diagnoses she is unable to perform her regular duties at work;" and (5) a duplicate of

26   the March 8, 2005 APS.  AR 0291-0294.

27         Upon MetLife's receipt of the additional materials, a MetLife nurse consultant

28   reviewed plaintiff's medical information, on both the STD and LTD claims.  On May 23,

United States District Court

For the Northern District of California

2005, in compliance with 29 C.F.R. § 2560.503-1(h)(3), (4) (full and fair review of claim and adverse benefit determination requires that "appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment"), the nurse consultant recommended referral of plaintiff's LTD claim for independent medical review by a cardiologist and a pulmonologist, and completed a referral form.  AR 0330-0331.  The referral form indicated the medical specialities requested, provided a brief summary of plaintiff's claim, the names of plaintiff's treating physicians, and the issues and questions to be addressed by the independent physician consultants.

Accordingly, MetLife obtained two medical opinions through a third-party vendor, Reed Review Services ("RRS").  The referral asked the independent physician consultants to review the medical records and to determine whether the information supported functional limitations; and if so, to identify the specific restrictions and limitations needed, as well as the clinical medical evidence that supported the restrictions and limitations.

Leonard Sonne, M.D., who is board-certified in pulmonary diseases and internal medicine, reviewed plaintiff's file and medical records, and prepared a report of his opinions dated May 27, 2005.  See AR 0325-0326.  Dr. Sonne noted that plaintiff was a 46-year-old female with a past history of rheumatic fever.  He noted further, "She had a mitral valve repair in 1990.  She has aortic insufficiency.  Left ventricular ejection fraction is 64% and normal.  O2 saturation on room air is 98%."  The documents reviewed by Dr. Sonne included "Internal review notes;" "Disability claim attending statement;" the January 24, 2005 letter from Dr. Hadley; the June 10, 2004 pulmonary function studies; the November 23, 2004 echocardiogram; and a medication list.  AR 0325.

Dr. Sonne found no objective documentation of any limitation, restriction or impairment.  Specifically, he found no office visit notes describing the history, examination findings, treatment, or response to treatment; and no exercise testing provided for review.  Dr. Sonne noted that plaintiff had been employed as an Operations Representative for BofA, which is a sedentary occupation.  Overall, he found "insufficient objective

United States District Court

For the Northern District of California

documentation to substantiate any restriction, impairment or limitation."  AR 0326.

Mark Friedman, M.D., board-certified in cardiovascular diseases and internal medicine, also reviewed plaintiff's file and medical records, and prepared a report of his opinions dated June 1, 2005.  See AR 0327-0329.  Dr. Friedman noted that plaintiff was a 46-year-old female with a history of rheumatic heart disease, "with mitral stenosis and aortic insufficiency who has had a remote surgical procedure for mitral valve repair in 1990."  He also noted a past history of a remote CVA and a history of asthma.  AR 0327. The documents reviewed by Dr. Friedman included Dr. Hadley's March 8, 2005 and April 29, 2005 Attending Physician Statements; the January 24, 2005 letter from Dr. Hadley; and the November 23, 2004 echocardiogram report by Dr. Argenal.  Id.

Dr. Friedman noted that plaintiff's cardiac status "has been stable with an echocardiogram performed 11/23/2004 demonstrating normal LV size and function with a LV ejection fraction of 64%, minimal residual mitral stenosis, normal estimated pulmonary artery pressure, and moderate aortic insufficiency."  Id.  He noted further that plaintiff was being followed by Dr. Argenal, who had recommended follow-up appointments and echocardiograms, on an annual basis.  Id.

Dr. Friedman found that plaintiff's history would support certain restrictions and limitations, including permanent restrictions on strenuous physical activity; heavy lifting; climbing stairs and ladders; exposure to dirt, dust, and fumes; and activity that could cause chest trauma.  AR 0328.   Nevertheless, he found that the medical records provided did not support "functional limitations related to the patient's history of rheumatic heart disease, prior mitral valve surgery and residual aortic insufficiency."  Id.

Based on the records provided, Dr. Friedman concluded that plaintiff's heart condition was and continued to be stable, and found no support for the diagnosis of congestive heart failure reported by plaintiff's pulmonologist, Dr. Hadley.  Specifically, Dr. Friedman found that the November 2004 echocardiogram "demonstrating normal LV systolic and diastolic function with normal LV chamber size, and only mild residual mitral stenosis and moderate aortic insufficiency, would not support that the patient has clinical

[congestive heart failure]."  Id.

In a letter dated June 20, 2005, MetLife informed plaintiff that the denial of her LTD benefits claim had been upheld on appeal.  AR 0323-0324.  The letter explained that the medical information submitted in support of the appeal had been reviewed by MetLife and by two independent physician consultants, and that it did not support plaintiff's claimed inability to perform the functions of her sedentary occupation.  The letter informed plaintiff that she had exhausted the Plan's administrative remedies, and that a copy of the documents and records relevant to her claim would be provided if she requested them.

In a July 15, 2005 letter to MetLife, plaintiff requested a copy of the "documents, records, or other information" relevant to her claim, as well as copies of any medical reports created by the physician consultants.  She also requested a copy of her "policy." AR 0321. The letter was received on July 22, 2005, and MetLife sent plaintiff a complete copy of the LTD claim file, including the administrative record, on August 1, 2005.  MetLife also informed plaintiff that any request for Plan documents (including copies of insurance contracts, summary plan descriptions, and annual reports) should be directed to the Plan's administrator, BofA Program, and gave her the necessary contact information.  AR 0320.

Meanwhile, on January 13, 2005, plaintiff filed an application with the Social Security Administration ("SSA") for Social Security Disability Insurance ("SSDI") benefits.  The SSA denied her application initially on March 1, 2005, and again upon reconsideration on June 15, 2005.  However, on December 13, 2006, the SSA granted plaintiff's application for SSDI benefits, finding that she had been disabled since November 2004.

On May 23, 2007, plaintiff sent a letter to BofA Program requesting a number of documents, including documents she had previously received from MetLife.  BofA Program responded on June 27, 2007, and sent plaintiff (in care of her attorney) the Bank of America Associate Handbook 2005 (the Summary Plan Description); the 2006 Addendum to that Associate Handbook; the Employee Benefit Plan, Bank of America, Long Term Disability Benefits, Full-Time Employees, January 1, 2003; Bank of America Group Benefits Program, effective January 1, 2003; the Employee Benefit Plan, Bank of America, Long

**United States District Court**
For the Northern District of California

1   Term Disability Benefits, Effective January 1, 2005 (Certificate of Insurance).  BofA

2   Program did not send plaintiff a copy of the administrative record because it was not within

3   the Program's custody.

4       Plaintiff filed this action on March 11, 2008, alleging failure to provide LTD benefits,

5   under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and 29 C.F.R. § 2560.503-1, and

6   under ERISA § 404(a)(1)(A), (B), (D), 29 U.S.C. § 1104(a)(1)(A), (B), (D) (the "denial of

7   benefits" claim).  Plaintiff also asserts a claim of entitlement to statutory penalties under

8   ERISA § 502(c), 29 U.S.C. § 1132(c), for failure to provide documents, against BofA

9   Program (the "penalties" claim).  Each side now seeks summary judgment.

10                              **DISCUSSION**

11  A.    "Denial of Benefits" Claim

12        1.    Legal Standard

13        Under ERISA § 502, a beneficiary or plan participant may sue in federal court "to

14  recover benefits due to him under the terms of his plan, to enforce his rights under the

15  terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29

16  U.S.C. § 1132(a)(1)(B); see also Aetna Health Inc. v. Davila, 542 U.S. 200, 210 (2004).

17        A claim of denial of benefits in an ERISA case "is to be reviewed under a de novo

18  standard unless the benefit plan gives the administrator or fiduciary discretionary authority

19  to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire &

20  Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Montour v. Hartford Life & Acc. Ins. Co.,

21  588 F.3d 623, 629 (9th Cir. 2009).  If the plan confers such discretion, then the denial is

22  reviewed for an abuse of discretion.  Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 110-

23  11 (2008) ("Glenn").  This court previously ruled that the standard of review in this case is

24  abuse of discretion.  See Order, filed January 29, 2010.

25        Under an abuse of discretion review, the dispositive issue is whether the denial of

26  benefits was reasonable.  Winters v. Costco Wholesale Corp., 49 F.3d 550, 553 (9th Cir.

27  1995); see also Conkright v. Frommert, __ U.S. __, 130 S.Ct. 1640, 1651 (2010).  An

28  ERISA administrator abuses its discretion only if it renders a decision without explanation,

construes provisions of the plan in a way that conflicts with the plain language of the plan, or relies on clearly erroneous findings of fact. Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan, 410 F.3d 1173, 1178 (9th Cir. 2005).  A finding is "clearly erroneous" when, even it is supported by evidence, the reviewing court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Id. (quotations omitted).  A court must "uphold the decision of an ERISA plan administrator if it is based upon a reasonable interpretation of the plan's terms and was made in good faith." Id. (citing Estate of Shockley v. Alyeska Pipeline Serv. Co., 130 F.3d 403, 405 (9th Cir. 1997)).

Where there is a structural conflict of interest because the claim fiduciary is also the funding source for the Plan, that conflict does not lead to a less deferential standard of review; rather, the conflict is merely one additional factor to be considered in determining whether a fiduciary abused its discretion.  Glenn, 554 U.S. at 111-12 ; see also Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 868 (9th Cir. 2008).  "A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 968 (9th Cir. 2006)

Among the factors the court may consider are whether there is evidence of bias, whether the fiduciary failed to investigate a claim adequately or ask the plaintiff for necessary evidence, whether the fiduciary failed to credit a claimant's reliable evidence, and whether the fiduciary's decision is against the weight of evidence in the record.  Id. Other factors courts have found relevant include whether the administrator acknowledged or distinguished a contrary disability determination by the SSA, Glenn, 554 U.S. at 118; whether the administrator presented outside medical reviewers with all the relevant evidence, id.; and whether the administrator conducted an in-person medical evaluation or relied instead on a paper review, Montour, 588 F.3d at 630.

An administrator can mitigate a conflict "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." Glenn, 554 U.S.

United States District Court

For the Northern District of California

1   at 117.  In addition, "[w]hen an administrator can show that it has engaged in an 'ongoing,

2   good faith exchange of information between the administrator and the claimant,' the court

3   should give the administrator's decision broad deference . . . ."  Abatie, 458 F.3d at 972.

4        Ordinarily, summary judgment is appropriate if there is no genuine issue as to any

5   material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

6   P. 56(a).  In ERISA actions, however, where the plaintiff is challenging the plan

7   administrator's denial of benefits and the district court has already determined that the

8   review is for abuse of discretion, "a motion for summary judgment is merely the conduit to

9   bring the legal question before the district court and the usual tests of summary judgment,

10  such as whether a genuine dispute of material fact exists, do not apply."  Bendixen v.

11  Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999), overruled in part on other grounds by

12  Abatie, 458 F.3d at 966-69; see also Nolan v. Heald College, 551 F.3d 1148, 1154 (9th Cir.

13  2009).  Thus, a summary judgment motion resting on the administrative record is not a

14  typical summary judgment, but rather, is a procedural vehicle for determining whether

15  benefits were properly granted or denied.

16       On the other hand, the traditional rules of summary judgment do apply to evidence

17  outside of the administrative record, including the requirement that the evidence must be

18  viewed in the light most favorable to the non-moving party.  Nolan, 551 F.3d at 1150.

19       2.       The Parties' Motions

20       Plaintiff argues that in denying her claim for LTD benefits, MetLife abused its

21  discretion under ERISA § 502(a)(1)(B), and breached its fiduciary duties under ERISA

22  § 404(a)(1).  Plaintiff asserts that summary judgment should be granted in her favor on this

23  "denial of benefits" claim, because MetLife's actions were arbitrary and capricious, and

24  unreasonable, and because its administration of her LTD claim was "infected by bias and

25  conflict of interest" and is therefore entitled to diminished deference.

26       Defendants contend that plaintiff's motion must be denied and that summary

27  judgment must be granted in their favor, because regardless of plaintiff's diagnoses, the

28  medical records she submitted did not show a level of functional impairment sufficient to

United States District Court

For the Northern District of California

1    meet the definition of "disability" under the Plan, and that MetLife, the claims administrator,

2    did not abuse its discretion when it denied the claim.

3        Plaintiff makes a number of arguments, which can be roughly allocated among five

4    main contentions – that MetLife's decision to deny LTD benefits was generally arbitrary and

5    capricious; that the decision to deny LTD benefits was unreasonable because it was

6    inconsistent with the decision to approve the request for STD benefits; that the denial of

7    LTD benefits was inconsistent with the terms of the Plan because MetLife improperly

8    required that plaintiff's claim be supported with "objective" evidence; that MetLife's reliance

9    on the opinions of the outside medical reviewers was unreasonable because MetLife did

10   not provide them with complete information and did not require an in-person Independent

11   Medical Examination ("IME"); that it was an abuse of discretion for MetLife to deny the

12   claim for LTD benefits without waiting for the SSA to make its determination regarding

13   plaintiff's application for SSDI benefits, or, alternatively, to refuse to revisit its denial of LTD

14   benefits after the SSA issued a favorable ruling on the claim for SSDI benefits.

15       In addition, plaintiff contends that the allegedly improper actions taken by MetLife

16   establish that its claims procedures are affected by the structural conflict of interest, and

17   that the court should therefore apply a diminished degree of deference to MetLife's

18   interpretation of the Plan and should view MetLife's articulated reasons for denying her

19   claim for LTD benefits with skepticism.  Plaintiff also argues that MetLife has not provided

20   any admissible evidence showing that its claims procedures are not affected by the

21   structural conflict of interest, or that it has taken any measures to mitigate the conflict.

22           a.    Whether the decision to deny benefits was generally arbitrary and

23                 capricious

24       Plaintiff argues that the denial of LTD benefits was generally arbitrary and

25   capricious, and constituted a breach of fiduciary duty, because MetLife decided to deny her

26   claim before it had received her application; and because it failed to investigate her claim

27   and failed to request that she provide specific medical information or tests.

28       First, in support of the assertion that MetLife decided to deny her claim before it had

United States District Court

For the Northern District of California

1    received her application, plaintiff cites to a February 21, 2005 note in the claim file, stating,

2    "ICP sent to Associate . . . Action Plan:  F/U for ICP from Associate.  If no response, deny

3    clm for lack of proof of disability.  Will review any medical upon receipt."  AR 309.  Plaintiff

4    contends that this note shows that MetLife intended to deny the claim before even

5    communicating with her.

6         However, as MetLife asserts, this note merely shows that plaintiff had already been

7    advised that if she did not return the completed forms by March 21, 2005, the claim would

8    be denied.  The addition of the phrase "[w]ill review any medical upon receipt" also reflects

9    what MetLife told plaintiff when it denied her claim for lack of medical support – that she

10   needed to provide all office notes and test results that supported the claimed disability, and

11   that MetLife would review the additional records upon receipt.  The note does not establish

12   any intent to deny the claim before it was even submitted.

13        Second, plaintiff argues that MetLife failed to investigate her claims.  She contends

14   that despite the fact that she gave MetLife the authorization to obtain information directly

15   from her doctors, MetLife never contacted her treating physicians.  However, the claim file

16   reflects that on March 15, 2005, the very day that MetLife received the completed APS

17   from Dr. Hadley, a MetLife case manager contacted Dr. Hadley's office to request the

18   referenced "attached" medical records, and was told that Dr. Hadley's office had given the

19   records to plaintiff.[2]  AR 0312.  MetLife then contacted plaintiff, who claimed she had

20   mailed the records to MetLife once, but that they had been returned to her, and that she

21   had already "resent" them, on March 11 or 12, 2005.  AR 0313.

22        Third, plaintiff asserts that MetLife breached its fiduciary duty by failing to specify

23   what specific additional medical documentation it required.  The administrative record

24   reflects that with her initial application, plaintiff submitted only the March 8, 2005 APS

25   completed by Dr. Hadley.  AR 0341-0342.  In her application, she described her job duties

26   as performing data entry, typing, and receiving incoming wires.  AR 0352.  In the APS, Dr.

27   ───────────────

28        [2]  Plaintiff did not sign the authorization to release records to MetLife until March 31,
     2005.  AR 0308.

United States District Court

For the Northern District of California

1   Hadley stated that plaintiff had been diagnosed with cardiac asthma and congestive heart

2   failure, and that she could not work due to "extreme asthma and coughing attacks" that left

3   her "unable to talk." AR 0361.  However, he also indicated that plaintiff could sit

4   continuously for eight hours, could twist/bend/stoop, reach above shoulder level, and

5   perform repetitive tasks with both hands.  Id.

6        Because the APS indicated both that plaintiff could not work, and that she could

7   perform tasks similar to those she identified as constituting her job duties, the

8   documentation fell short of what the Plan required claimants to provide – evidence of

9   disability and inability to perform the material duties of her regular job.

10       After receiving no additional records, despite having requested them from both

11  plaintiff and Dr. Hadley's office, AR 0312-AR 0313, MetLife denied the claim.  In the March

12  23, 2005 denial letter, MetLife clearly informed plaintiff what additional information was

13  required – "[a]ll office notes and test results from your date of disability that support the

14  stated diagnosis and restrictions and limitations." AR 0342.  MetLife also advised plaintiff

15  that if she provided the requested medical information, her claim would be "evaluated

16  based on the medical records provided."  Id.

17       Nevertheless, plaintiff claims that MetLife did not provide her with sufficient

18  information regarding the medical records that were necessary to perfect her claim.  In

19  support, she cites Saffon, 522 F.3d at 870-71, where the Ninth Circuit found an abuse of

20  discretion because the claims administrator (also the insurer) failed to explain "in a manner

21  calculated to be understood by the claimant" what she must do to perfect her claim.  Id.,

22  522 F.3d at 870-71 (citing 29 C.F.R. § 2560.503-1(g)).

23       The facts in Saffon are clearly distinguishable from the facts in this case.  In Saffon,

24  the claims administrator originally approved the claimant's request for LTD benefits, but

25  then terminated the benefits after a year on the basis that the claimant "no longer me[t] the

26  definition of disability," and advised the claimant that she could appeal the decision by

27  providing "objective medical information to support your inability to perform the duties of

28  your occupation." Id. at 866, 869.  In this case, by contrast, MetLife told plaintiff that she

United States District Court

For the Northern District of California

1  needed to submit "[a]ll office notes and test results from your date of disability that support

2  the stated diagnosis and restrictions and limitations."  AR 0342.  The court in <u>Saffon</u> noted

3  the claimant's difficulty in ascertaining what was intended by "objective medical

4  information."  <u>Saffon</u>, 522 F.3d at 869.  Here, MetLife made a request for specific types of

5  medical evidence.

6       In response to the denial letter, plaintiff submitted a copy of Dr. Hadley's February

7  25, 2005, certification to the EDD, and a copy of Dr. Hadley's supplemental APS, dated

8  April 29, 2005, which was almost identical to the original March 8, 2005, APS.  In addition,

9  with her May 2005 appeal, she submitted a pulmonary function laboratory report dated

10  June 10, 2004; an echocardiogram report dated November 23, 2004; a single sheet of

11  office notes regarding a December 22, 2004 consultation with Dr. Argenal; a letter from Dr.

12  Hadley dated January 24, 2005, stating that plaintiff "may qualify for permanent disability

13  for her heart and lung condition."

14       After receiving no further information from plaintiff or her doctor, MetLife provided

15  the independent physician consultants with a copy of the record for their review.  As noted

16  above, the physician consultants reviewed all records submitted by plaintiff, and found that

17  the evidence did not support the claimed disability.  Notwithstanding MetLife's clear

18  description of the additional records required, plaintiff submitted no office notes from any of

19  her three treating physicians, other than the one page from Dr. Argenal.  The only test

20  results were the report of the June 2004 pulmonary function test (which predated the

21  claimed onset of disability), and the November 23, 2004 echocardiogram report, which, as

22  Dr. Friedman explained, did not support the diagnosis of congestive heart failure.

23       This paucity of records is somewhat surprising, in view of the fact that in her

24  application for LTD benefits, plaintiff stated that she had been hospitalized on March 8,

25  2005 (the same date that Dr. Hadley completed the APS that MetLife received on March

26  15, 2005), yet no medical record she submitted (including Dr. Hadley's supplemental APS

27  dated April 29, 2005) confirmed or even mentioned this hospitalization.  Plaintiff also told

28  the MetLife claim manager in a April 28, 2005 telephone conversation that she had

17

United States District Court

For the Northern District of California

1  undergone unspecified "testing" that very day, but that the testing had to be stopped due to

2  her breathing problems.  Yet nowhere in the records she submitted is there any mention of

3  that "testing" or who ordered it.

4          b.      Whether the decision to deny the claim for LTD benefits was

5                  inconsistent with the decision to approve the request for STD benefits

6          Plaintiff asserts that MetLife's decision to deny benefits under the LTD Plan was

7  unreasonable, because only a few months before that decision, it had found that plaintiff

8  was entitled to STD benefits.  Plaintiff contends that having found her entitled to STD

9  benefits, MetLife was obligated to find her disabled and eligible for benefits under the LTD

10 Plan.

11         Plaintiff argues that the LTD Plan's requirement that the claimant establish the

12 inability "to perform each of the material duties of [his/her] own occupation" should have

13 been construed in the same way as the requirement in the STD Plan.  She asserts that

14 these were "similar claims" and that MetLife should have treated them "consistently" under

15 the requirements of 29 C.F.R. § 2560.503-1(b)(5) ("claims procedures for a plan will be

16 deemed to be reasonable only if . . . where appropriate, the plan provisions have been

17 applied consistently with respect to similarly situated claimants").

18         Documents submitted by MetLife show that it was BofA that received and approved

19 plaintiff's STD claim.  MetLife did not begin to administer plaintiff's STD claim until March

20 18, 2005, almost a month after it received her LTD claim.  MetLife's denial of the claim for

21 LTD benefits was not inconsistent with BofA's determination that plaintiff was entitled to

22 STD benefits.  The STD benefits were administered under a different plan than the LTD

23 benefits, with different eligibility standards, and requiring two distinct determinations.

24         The standard applied to the STD claim was the standard set out by the FMLA – that

25 is, whether a medical provider had certified a "serious health condition" that precluded

26 working.  Eligibility for STD benefits under the BofA Plan was limited to a maximum number

27 of weeks, depending on the length of time of employment.  The standard applied to LTD

28 claim was set forth in the LTD Plan – plaintiff was required to provide proof of "disability," as

United States District Court

For the Northern District of California

1    defined in the Plan.

2            c.    Whether the denial of LTD benefits was inconsistent with the terms of

3            the Plan

4        Plaintiff contends that MetLife's denial of benefits was inconsistent with the terms of

5    the Plan, as the Plan does not require that a claim be supported with "objective" evidence

6    or "objective" proof of disability.  Plaintiff also argues that because the Plan involves an

7    "own occupation" policy, it was an abuse of discretion for MetLife to fail to obtain a

8    description of plaintiff's job duties from BofA before finding her not disabled.

9        Generally, an ERISA "participant or beneficiary" who is suing "to recover benefits

10   due to him under the terms of the plan," ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B),

11   must establish his or her entitlement to benefits.  Glazer v. Reliance Standard Life Ins. Co.,

12   524 F.3d 1241, 1247 (11th Cir. 2008); see also Farley v. Benefit Trust Life Ins. Co., 979

13   F.2d 653, 658 (8th Cir. 1992).  Here, in addition, the Plan places the burden of providing

14   proof of disability on the claimant.  The Plan provides that MetLife will pay benefits "[w]hen

15   we receive proof that you are Disabled."  AR 0052.  "Proof must describe the . . . nature

16   and extent of the cause for which a claim is made; it must be satisfactory to us."  AR 0056.

17   To submit a claim for disability benefits, "the claimant must complete the appropriate claim

18   form and submit the required proof."  AR 0064.

19       MetLife was entitled to seek objective proof of functional impairment.  See e.g.,

20   Walker v. Metropolitan Life Ins. Co., 2010 WL 1946898 at *13-14 (C.D. Cal., May 12, 2010)

21   (due to discretion granted insurer as claims administrator to interpret terms of plan, insurer

22   had discretion to require objective evidence of disability); see also Wiley v. Cendant Corp.

23   Short Term Disability Plan, 2010 WL 309670 at *9 (N.D. Cal., Jan. 19, 2010); Thompson v.

24   Insurance and Benefits Tr./Comm. Peace Officers Res. Assoc. of Calif., 670 F.Supp. 2d

25   1052, 1067 (E.D. Cal. 2009).  The very concept of "proof" connotes objectivity.  See

26   Maniatty v. UnumProvident Corp., 218 F.Supp. 2d 500, 504 (S.D.N.Y. 2002) (where plan

27   document requires "proof" but does not require that "proof" be "objective," insurer does not

28   abuse its discretion by requiring objective evidence to support a claimed lack of

United States District Court

For the Northern District of California

1   functionality).

2        Plaintiff was diagnosed with various physical conditions – mild mitral stenosis,

3   moderate aortic insufficiency, cardiac asthma, congestive heart failure – which are

4   generally observable by a clinician in an examination or with testing.  This is not a case like

5   Salomaa v. Honda Long Term Disability Plan, __ F.3d __, 2011 WL 768070 (9th Cir.,

6   March 7, 2011), where the court found that the plan administrator had improperly

7   demanded objective tests to establish the existence of a condition (chronic fatigue

8   syndrome) for which there are no objective tests, see id., 2011 WL 768070 at *8-10; or a

9   case like Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869 (9th Cir.

10  2004), where the court noted that "[o]bjective tests are administered to rule out other

11  diseases, but do not establish the presence or absence of fibromyalgia," id. at 872,

12  overruled on other grounds by Abatie, 458 F.3d at 955.

13       Plaintiff provided a description of her job duties in her application for LTD benefits.

14  Before denying plaintiff's claim on appeal, MetLife obtained review by two outside medical

15  consultants, to whom it provided a complete copy of plaintiff's LTD claim record.  It was

16  because of the lack of objective medical support for plaintiff's claimed disability based on

17  cardiac and pulmonary conditions, that both outside medical reviewers found that there was

18  insufficient evidence to establish a functional limitation that would have prevented plaintiff

19  from performing her job duties.

20            d.      Whether MetLife's reliance on the opinions of the independent medical

21                    consultants was reasonable

22       Plaintiff argues that MetLife's reliance on the opinions of the outside medical

23  reviewers was unreasonable, because the reviewers were not provided with complete

24  information.  First, plaintiff contends that the materials given to the reviewers should have

25  included the STD claim file and a description of her job duties; and that MetLife should

26  have advised the reviewers that, according to the April 28, 2005 claim file notes, plaintiff

27  had coughed multiple times during a telephone call with the case manager, and had also

28  told the case manager that she had gone for "testing" that day, but that it "had to be

United States District Court

For the Northern District of California

1   stopped due to her breathing problems." See AR 0288.

2       In seeking a review of plaintiff's claim for LTD benefits and the supporting medical

3   information, MetLife was not required to submit the STD claim file to the independent

4   physician consultants.  MetLife sought the review in aid of its determination whether plaintiff

5   was eligible for LTD benefits commencing 180 days after the onset of claimed disability

6   (November 14, 2004).  The question posed to the consultants was whether the medical

7   information plaintiff had submitted in support of her claim for LTD benefits supported

8   functional limitations – and if so, what specific restrictions and limitations were needed, and

9   what specific clinical medical evidence supported those restrictions and limitations.  As

10  explained above, the STD Plan and the LTD Plan had different eligibility standards, and

11  required two distinct determinations.

12      As for plaintiff's assertion that MetLife abused its discretion by not advising the

13  independent physician consultants that plaintiff had told a MetLife case manager in March

14  2005 about the unidentified "testing" that had to be stopped "due to her breathing

15  problems," AR 0288, a comment in the administrator's claim file cannot be considered the

16  equivalent of objective medical evidence, which could reasonably be reviewed by an

17  outside medical reviewer.  If, in fact, such "testing" was conducted, it was plaintiff's

18  responsibility to have the referring doctor submit a report of the results of the "testing" to

19  MetLife.

20      Nor is the court persuaded by plaintiff's argument that because one of the

21  independent medical consultants (evidently referring to Dr. Sonne) complained that there

22  was insufficient documentation to support the asserted functional restrictions, this

23  establishes that MetLife did not provide all plaintiff's records.  This is not a fair reading of

24  Dr. Sonne's statement.  The problem, as defendants note, was that the evidence provided

25  by plaintiff and her doctor did not establish the existence of a functional impairment severe

26  enough to keep her from performing her regular job duties of typing, data entry, and receipt

27  of wires – not that MetLife withheld some crucial part of the file from the outside reviewers.

28      Second, plaintiff contends that it was improper for MetLife to provide the

21

United States District Court

For the Northern District of California

1    independent physician consultants with only a paper record to review, with no allowance for

2    a face-to-face examination of plaintiff.  There is no requirement in ERISA that the claims

3    administrator order an in-person IME of a claimant, and consulting physicians' opinions

4    based on reviews of medical records are an acceptable basis of an administrator's

5    determination.  See Jordan, 370 F.3d at 879-80 (plan administrator, in accepting opinion of

6    "reviewing physician" over opinion of plaintiff's treating physicians, did not abuse

7    discretion); see also Kushner v. Lehigh Cement Co., 572 F.Supp.2d 1182, 1192 (C.D. Cal.

8    2008) (ERISA does not require IMEs).

9        While it might be an abuse of discretion in some circumstances for the claims

10   administrator to fail to order an IME of a claimant, this is not one of those cases.  Where, as

11   here, the ERISA claims administrator retains the discretion to interpret the terms of the

12   plan, and there is no objective support for the claimed disability, the administrator may elect

13   not to conduct an IME.  See Manning v. American Republic Ins. Co., 604 F.3d 1030, 1041

14   (8th Cir.) (ERISA plan administrator is not required to order an IME when the claimant's

15   evidence is facially insufficient to support a finding of disability), cert. denied, 131 S.Ct. 648

16   (2010); Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 91 (2nd Cir. 2009) (where

17   ERISA plan administrator retains discretion to interpret terms of plan, administrator may

18   elect not to conduct IME, particularly where claimant's medical evidence on its face fails to

19   establish disability); Williams v. Aetna Life Ins. Co., 509 F.3d 317, 325 (7th Cir. 2007)

20   (finding reasonable a denial of benefits where the ERISA plan administrator refused to

21   order an independent review and there was a lack of "objective support" regarding the

22   claimant's "functional abilities").

23       The medical evidence submitted by plaintiff and her physicians failed to establish

24   that she was functionally impaired from performing her occupation within the meaning of

25   the Plan's definition of "disability," which meant that she failed to establish eligibility for Plan

26   benefits.  The same medical evidence was evaluated by independent physicians in

27   appropriate specialties, who found that plaintiff was not functionally impaired from working

28   as a result of her diagnosed medical issues.  MetLife was entitled to credit the medical

1    opinion of those physicians, and did not abuse its discretion in doing so.

2              e.    Whether it was an abuse of discretion for MetLife to fail to consider the
3                    SSA's favorable determination

4         Plaintiff makes two distinct arguments with regard to the SSDI claim and the SSA's

5    favorable decision.  First, she complains that MetLife encouraged her to apply for SSA

6    benefits, but then "adjudicated her LTD claim with terminal swiftness" and "reversed its

7    prior disability determination" (referring to the prior approval of STD benefits) before the

8    SSA process "could even run its course."  She contends that it was an abuse of discretion

9    for MetLife to encourage her to apply for SSDI benefits and to then proceed to rule on the

10   LTD benefits claim instead of waiting for the determination by the SSA.

11        However, plaintiff has cited no authority in support of this proposition.  Moreover,

12   ERISA regulations require that notification of a disability benefit determination on review

13   must ordinarily be provided to the claimant "within a reasonable time," but not less than 45

14   days after receipt of the request for review.  See 29 C.F.R. § 2560.503-1(i)(1)(i), (3)(i).

15   Thus, it would have been unreasonable for MetLife to have delayed reaching a decision for

16   18 months.

17        Second, plaintiff contends that MetLife's "refusal" to consider the favorable SSA

18   determination before denying her claim for LTD benefits was an abuse of discretion.

19   Plaintiff concedes that a claims administrator is not bound by the SSA's determination, but

20   argues that under Montour, a complete disregard for a contrary conclusion raises questions

21   about whether the adverse benefits determination was the product of a principled and

22   deliberative reasoning process.  See Montour, 588 F.3d at 635.

23        As indicated above, the SSA granted plaintiff's claim for SSDI benefits on December

24   13, 2006, nearly 18 months after MetLife had advised plaintiff that her claim for LTD

25   benefits had been denied on appeal, and that she had exhausted her administrative

26   remedies.  The cases cited by plaintiff in support of this argument (that it was an abuse of

27   discretion for MetLife to fail to consider the SSA decision) all generally stand for the

28   proposition that where a LTD claims administrator encourages or even compels a claimant

23

United States District Court
For the Northern District of California

1  to apply for SSA benefits, and the claimant receives a favorable determination from the

2  SSA, it is an abuse of discretion for the LTD claims administrator to subsequently deny an

3  LTD claim, or to  terminate benefits, without considering the SSA determination.  See

4  Glenn, 554 U.S. at 124 (Roberts, C.J., concurring); Montour, 588 F.3d at 635-36; Calvert v.

5  Firstar Finance, Inc., 409 F.3d 286, 294-95 (6th Cir. 2005), cited in Hobson, 574 F.3d at 91;

6  Holler v. Hartford Life and Acc. Ins. Co., 737 F.Supp. 2d 883, 896-97 (S.D. Ohio 2010).

7        Here, however, unlike the situation in, for example, Montour, where the SSA

8  reached a favorable decision years before the insurer terminated the claimant's benefits,

9  MetLife denied the claim approximately 18 months before the favorable SSA decision.  The

10  question whether a claim determination was an abuse of discretion must be resolved from

11  the record that was before the claim administrator when the decision was made, together

12  with any "conflict-of-interest" evidence that the reviewing court finds admissible.  See

13  Abatie, 458 F.3d at 970.  MetLife could not have considered the fact of the SSA

14  determination when it was deciding the claim for LTD benefits, as SSA did not approve

15  plaintiff's claim for SSDI benefits until a year and a half after the final determination by

16  MetLife of plaintiff's LTD claim.[3]

17        Furthermore, the decision granting plaintiff's application for SSDI benefits was based

18  in large part on evidence that was not available at the time of MetLife's denial of her claim

19  for LTD benefits.  In particular, the SSA found that the opinion of plaintiff's treating

20  physician, Dr. Hadley, was "sufficiently supported by the medical evidence, particularly the

21  history and records of [plaintiff's September 2006] hospitalization."  Because that

22  hospitalization occurred more than a year after MetLife had denied plaintiff's claim for LTD

23  benefits, the fact that it provided strong support for the SSDI benefits determination is

24  irrelevant to this case.  As defendants correctly point out, plaintiff's receipt of SSDI benefits

25  does not entitle her to LTD benefits, and there is no authority the court is aware of that

26  requires reopening a closed LTD claim following a favorable determination by the SSA.

27  _____

28        [3]  For this reason, plaintiff's claim that MetLife abused its discretion by not seeking
plaintiff's medical records from the SSA is also without merit.

United States District Court

For the Northern District of California

f.      Effect of MetLife's structural conflict on its exercise of discretion

Plaintiff asserts that the court should view MetLife's exercise of discretion with a high degree of skepticism, for two main reasons – first, because MetLife's structural conflict of interest impacted many of its actions or decisions in this case; and second, because MetLife has provided no admissible evidence showing that its claims procedures are not affected by the structural conflict of interest.

In considering whether a claims administrator has abused its discretion, the court is required to "weigh" the conflict more or less "heavily," depending on the other evidence that is available. Saffon, 522 F.3d at 868 (quoting Abatie, 458 F.3d at 968).  If there is no evidence of malice, self-dealing, or a parsimonious claims-granting history, the court should view the conflict with a low level of skepticism. Id.  On the other hand, the fact of the conflict weighs more heavily if, for example, there is evidence that the administrator has given inconsistent reasons for denial of the claim, had failed to adequately investigate the claim or ask the claimant for necessary evidence, or has repeatedly denied benefits to deserving claimants by interpreting plan terms incorrectly. Id.

Plaintiff argues that the facts in this case warrant a "heavy" weighing of MetLife's structural conflict.  Among other things, she asserts that MetLife's denial of the LTD claim was inconsistent with its prior approval of her request for STD benefits, and that MetLife improperly refused to consider the STD file as part of the LTD claim.  She also contends that MetLife failed to adequately investigate her claim because it failed to contact her doctors for additional information, failed to order an IME, and relied on a "paper review" by the outside medical consultants; that MetLife failed to identify the specific information it required her to provide for a favorable decision; that MetLife improperly found that she could perform sedentary work despite having failed to obtain a job description; that MetLife retained outside medical reviewers from a company that was "biased" because it receives millions of dollars in revenue from MetLife for reviews of MetLife's claims; and that MetLife improperly refused to consider the favorable SSA determination,

While the court weighs the financial conflict of interest in its analysis of whether

United States District Court

For the Northern District of California

1    MetLife abused its discretion in denying plaintiff's claim, the court finds no evidence

2    presented in this case showing any malice, self-dealing, or parsimonious claims granting on

3    the part of MetLife.  In addition, for the reasons stated above in subsections (a) through (e),

4    the court finds that none of the actions identified by plaintiff supports a finding that MetLife's

5    decision was biased or affected by the structural conflict.  Finally, the court finds that

6    MetLife's reliance on the reports by the independent physician consultants was reasonable.

7    As defendants argue, the fact that a physician makes his or her living, at least in part,

8    reviewing claims for a claims administrator does not necessarily warrant reviewing a

9    determination with enhanced skepticism.  See Letvinuck v. Aetna Life Ins. Co., 2009 WL

10   5184459 at *15 (C.D. Cal., Dec. 17, 2009) (fact that outside medical reviewers make their

11   living, at least in part, reviewing claims for Aetna proves little, as Aetna would likely be hard

12   pressed to find someone to review its claims for free).

13        Plaintiff also argues that MetLife provided no admissible evidence showing that its

14   claims procedures are not affected by the structural conflict of interest.  With their motion,

15   defendants submitted a declaration by Gregory Hafner, a Director in the Department of

16   Disability Product Management at MetLife, attached as an exhibit to a declaration by

17   Rebecca A. Hull, counsel for MetLife.[4]

18        Mr. Hafner states that he has personal knowledge of MetLife's claims handling

19   practices, that MetLife reviews each claim for disability benefits on its own merits and

20   consistently (regardless of how benefits are funded), and that every claim decision is based

21   solely upon information in the individual claimant's claim file.  He also summarizes the

22   various measures MetLife has taken in order to ensure the integrity of its claims

23   processing.  For example, he states that MetLife's finances are kept separate from claims;

24   that MetLife's claims offices are geographically separate from its finance offices; that

25   employees who administer disability claims do not report to Finance Department

26   _____

27        [4]  Plaintiff has filed a motion to "strike" the Hull Declaration and the Hafner Declaration
appended thereto.  The motion appears to be nothing more than an evidentiary objection.  For
28   the reasons discussed above, the court assigns little probative weight to the Hafner
Declaration.

United States District Court

For the Northern District of California

1   employees, and Finance Department employees do not make, direct, or have any

2   association with claim decisions; and that claims specialists do not have access to claim

3   reserve information, and do not receive compensation, awards, bonuses, other financial

4   benefits or performance recognition based upon the value or the number of the claims they

5   deny or terminate.

6        Defendants contend that under <u>Glenn</u>, such evidence substantially diminishes the

7   potential significance of the structural conflict of interest, and that the conflict should

8   therefore be given little if any weight in the court's analysis of whether the decision

9   regarding plaintiff's LTD benefits was an abuse of discretion.

10       Plaintiff argues, however, that the Hafner Declaration is inadmissible hearsay, and

11  that Mr. Hafner fails to articulate any basis for his purported personal knowledge of the

12  facts he asserts.  Plaintiff also contends that the declaration is of little relevance because it

13  post-dates the claims determination that is at issue in this case, and does not state that the

14  procedural safeguards were in place at the time MetLife denied her claim.  Plaintiff asserts

15  that MetLife has provided no other evidence that it has put any procedures in place to

16  reduce bias or to insure accurate claims, and that this failure to establish the existence of

17  procedures, protocols, or safeguards is evidence of the impact of the conflict of interest.

18       The declaration, which is dated February 10, 2010, was originally filed in <u>Beaver v.</u>

19  <u>Bank of the West Welfare Benefits Plan</u>, C-09-2177 WHA (N.D. Cal.) in support of a motion

20  noticed for hearing on March 18, 2010.  Mr. Hafner states, "I have been informed that the

21  dates relevant to this litigation are January 2008 forward.  Prior to that date, and to the

22  present, all of the procedures listed [in the declaration] have been in place."

23       Defendants concede that the declaration was filed by MetLife in another ERISA

24  benefits case, but claim that it was MetLife's counsel's understanding that comparable

25  measures were in place at the time relevant to plaintiff's own claim.  Defendants assert that

26  their counsel told plaintiff's counsel that MetLife could provide an updated declaration

27  addressing the specific time period in which plaintiff's claim was administered, but that

28  plaintiff's counsel never sought any further information regarding Mr. Hafner or his

1    testimony.

2          The court finds that the Hafner declaration is of marginal relevance to the claims in

3    this case, as there is no evidence that the procedures Mr. Hafner describes were in fact in

4    place in 2005 when MetLife was evaluating plaintiff's claim for LTD benefits.  Thus,

5    plaintiff's objections to the Hafner Declaration are sustained.  Nevertheless, the court also

6    finds that MetLife's failure to provide evidence showing that it had procedures in place to

7    ameliorate the effect of the structural conflict is not sufficient, standing alone, to warrant a

8    finding that MetLife abused its discretion when it denied plaintiff's claim.

9          While it is true that a structural conflict of interest exists in this case, the court finds

10   no evidence that the conflict affected the administration of plaintiff's claim.  Even in the face

11   of a conflict of interest, discretionary review still applies if the plan documents so provide,

12   because "a systemic conflict of interest does not strip a plan administrator of deference."

13   Conkright, 130 S.Ct. at 1646-47.  A structural conflict bears little weight, absent evidence

14   that it "tainted the entire administrative decisionmaking process."  Montour, 588 F.3d at

15   631.  Here, plaintiff has not provided evidence establishing any of the factors that the

16   Supreme Court or the Ninth Circuit have identified as indicating bias or bad faith.

17   B.    "Penalties" Claim

18         1.    Legal Standard

19         ERISA provides a private cause of action against a plan administrator who fails or

20   refuses to comply with a request for information that the administrator is required to furnish.

21         Any administrator . . . who fails or refuses to comply with a request for any
           information which such administrator is required by this subchapter to furnish
22         to a participant or beneficiary (unless such failure or refusal results from
           matters reasonably beyond the control of the administrator) by mailing the
23         material requested to the last known address of the requesting participant or
           beneficiary within 30 days after such request may in the court's discretion be
24         personally liable to such participant or beneficiary in the amount of up to $100
           a day from the date of such failure or refusal, and the court may in its
25         discretion order such other relief as it deems proper.

26   29 U.S.C. § 1132(c)(2).  Only plan administrators – not third-party claims administrators –

27   may be sued under § 1132(c).  Sgro v. Danone Waters of North America, Inc., 532 F.3d

28   940, 945 (9th Cir. 2008).

United States District Court

For the Northern District of California

1    2.    The Parties' Motions

2    Plaintiff seeks summary judgment on the "penalties" claim, arguing that BofA

3  Program violated ERISA by failing to provide her with the administrative record of her LTD

4  benefits claim, and that she is therefore entitled to statutory penalties under 29 U.S.C.

5  § 1132(c)(2).

6    Plaintiff claims that both she and her attorney made "multiple requests for MetLife's

7  administrative record," and that neither BofA nor MetLife has ever provided all its

8  components.  In particular, plaintiff argues that the administrative record for plaintiff's LTD

9  claim should have included the contents of the STD claims file, and also should have

10 included any internal rule, guideline, protocol, or other similar criterion that was relied upon

11 in making the adverse determination.

12   The record shows that on July 15, 2005, plaintiff wrote to MetLife to request copies

13 of the "documents, records or other information" in MetLife's possession that were relevant

14 to her claim, copies of the independent physician consultant's reports, and a copy of "the

15 policy."  AR 0321.  On August 1, 2005, MetLife sent plaintiff a complete copy of her claim

16 file, including the administrative record.  AR 0320.  MetLife also advised plaintiff that any

17 request for Plan documents, including copies of insurance contracts, summary plan

18 descriptions, and annual reports, should be directed to BofA, the Plan Administrator.  Id.

19   More than a year and a half later, on May 27, 2007, plaintiff sent a letter to BofA

20 Program requesting numerous documents relating to the denial of her claim for LTD

21 benefits, including Plan documents and the "administrative record."  On June 27, 2007,

22 BofA Program sent plaintiff, through her attorney, copies of all LTD Plan documents.

23   Plaintiff's main complaint appears to be that the administrative record she was

24 provided did not include the STD claim file.[5]  Plaintiff argues that the "administrative record"

25 _____

26   [5] As the court found with regard to the "denial of benefits" claim, however, the STD Plan
and the LTD Plan are separate and independent, and contain different eligibility requirements.
27 Notwithstanding the fact that plaintiff applied for, and received, STD benefits for the maximum
period, she was still required to separately apply for and demonstrate eligibility for benefits
28 under the LTD Plan.  Plaintiff has not sued the STD Plan, and any consideration of the STD
benefits is irrelevant to the present case, which involves a claim that MetLife failed to pay

United States District Court

For the Northern District of California

1   in an ERISA benefit case includes all materials the insurer considered in reaching its

2   determination, and all materials it had in its possession but did not consider – claims

3   policies, procedures, and guidelines; evidence of safeguards it uses to ensure fair,

4   accurate, and consistent claims handling; and anything else that is "relevant" to the claims

5   determination.  In support, she cites  Montour, 588 F.3d at 632 n.4 (administrative record in

6   an ERISA case consists of "the papers the insurer had when it denied the claim"), and also

7   cites 29 C.F.R. § 1560.503-1(g), (h), and (m).

8          Defendants argue that plaintiff's motion should be denied, and that summary

9   judgment should be entered in BofA Program's favor, for three reasons.  First, defendants

10  contend that plaintiff cannot base a claim for recovery of penalties from BofA Program on

11  the text of ERISA or any case law.  They note that 29 U.S.C. § 1132(c)(2) imposes

12  penalties only for a plan administrator's failure to "comply with a request for any information

13  which such administrator is required by this subchapter to furnish to a participant or

14  beneficiary."  However, they assert, the only requirement set forth in "this subchapter" (29

15  U.S.C. §§ 1001-1191c) regarding requests for information by ERISA claimants is the

16  following:  "The administrator shall, upon written request of any participant or beneficiary,

17  furnish a copy of the latest updated summary plan description, and the latest annual report,

18  any terminal report, the bargaining agreement, trust agreement, contract, or other

19  instruments under which the plan is established or operated."  29 U.S.C. § 1024(b)(4).

20         Defendants contend that in this case, BofA Program provided plaintiff (through her

21  counsel) exactly what was required – copies of the relevant Plan documents, in compliance

22  with § 1024(b)(4).  They argue that the Program had no duty to provide the "administrative

23  record" because it is not a document under which the Plan is "established or operated."

24         Second, defendants assert that BofA Program was not obligated to provide plaintiff

25  with a copy of the LTD claims file because it was in the possession of MetLife, the claims

26  administrator.  They contend that BofA Program told plaintiff that she would need to

27  _____

28  benefits under the LTD Plan.

30

United States District Court

For the Northern District of California

1  request the file from MetLife.  They also note that the LTD claims file pertains only to the

2  claim for LTD benefits (not to STD benefits), and that plaintiff's request sought only

3  documents relating to the claim for LTD benefits.

4         Third, defendants assert that even if BofA Program was required to provide plaintiff

5  with all the documents she requested, including the LTD claim file, penalties are not

6  warranted, because plaintiff cannot show that BofA Program acted in bad faith, or that she

7  was prejudiced by BofA Program's failure to produce the administrative record.

8         Plaintiff bases her construction of "administrative record" on subsections (g), (h), and

9  (m) of 29 C.F.R. § 2560.503-1.  This regulation was promulgated by the Secretary pursuant

10  to 29 U.S.C. § 1133, which imposes obligations on ERISA plans with regard to the "full and

11  fair hearing" of a denial of benefits.

12              In accordance with regulations of the Secretary, every employee
       benefit plan shall –

13

14              (1) provide adequate notice in writing to any participant or beneficiary
       whose claim for benefits under the plan has been denied, setting forth the
       specific reasons for such denial, written in a manner calculated to be

15       understood by the participant, and

16              (2) afford a reasonable opportunity to any participant whose claim for
       benefits has been denied for a full and fair review by the appropriate named

17       fiduciary of the decision denying the claim.

18  29 U.S.C. § 1133.

19         The regulation sets forth "minimum requirements for employee benefit plan

20  procedures pertaining to claims for benefits by participants and beneficiaries."  29 C.F.R.

21  § 1560.503-1(a).  Under subsection (g), a plan administrator that makes an adverse

22  benefits determination must provide a claimant with written or electronic notification of the

23  decision, and, "[i]f an "internal rule, guideline, protocol, or other similar criterion was relied

24  upon in making the adverse determination," must set forth

25       either the specific rule, guideline, protocol, or other similar criterion; or a
       statement that such a rule, guideline, protocol, or other similar criterion was

26       relied upon in making such adverse determination and that a copy of such
       rule, guideline, protocol, or other criterion will be provided free of charge to

27       the claimant upon request.

28   29 C.F.R. § 1560.503-1(g)(1)(v)(A).

United States District Court

For the Northern District of California

1    Under subsection (h), every benefit plan "shall establish and maintain a procedure

2 by which a claimant shall have a reasonable opportunity to appeal an adverse benefit

3 determination to an appropriate named fiduciary of the plan," and such claims procedures

4 "will not be deemed to provide a claimant with a reasonable opportunity for a full and fair

5 review" of an adverse benefit determination unless the claims procedures, among other

6 things, "[p]rovide that a claimant shall be provided, upon request and free of charge,

7 reasonable access to, and copies of, all documents, records, and other information relevant

8 to the claimant's claim for benefits."  29 C.F.R. § 1560.503-1(h)(2)(iii).

9    Under subsection (m), a "document, record, or other information" is considered

10 "relevant to" a claim for benefits if the document, record, or information

11    (i) Was relied upon in making the benefit determination;

12    (ii) Was submitted, considered, or generated in the course of making the
      benefit determination, without regard to whether such document, record, or
13    other information was relied upon in making the benefit determination; [or]

14    (iii) Demonstrates compliance with the administrative processes and
      safeguards required pursuant to paragraph (b)(5) of this section in making the
15    benefit determination[.]

16 29 C.F.R. § 1560.503-1(m)(8)(i)-(iii).

17    Plaintiff contends that because under subsection (m), documents or records

18 "relevant" to the claims administrator's determination are documents or records "submitted,

19 considered, or generated" in the course of making the benefit determination, any medical

20 documents submitted in support of her STD claim would have been both "relevant" and

21 "papers the insurer had when it denied the claim," as would the rules, guidelines, protocols,

22 or other similar criteria that MetLife relied on in denying her claim for LTD benefits.

23    Plaintiff argues § 1132(c) is not limited to plan documents, and that an

24 administrator's failure to produce any document "relevant" to a claim determination can

25 subject it to penalties.  Plaintiff cites to Sgro, where the Ninth Circuit stated that "[t]he

26 amendments [to 29 C.F.R. § 2560.503-1] . . . broadened administrators' duties:

27 Administrators must how turn over, on request, the documents 'generated in the course of

28 making the benefit determination.'"  Sgro, 532 F.3d at 945.

32

United States District Court

For the Northern District of California

1    The "Scope and Purpose" provision of 29 C.F.R. § 2560.503-1 provides, "In

2  accordance with the authority of . . . 29 U.S.C. § 1133, 1135, this section sets forth

3  minimum requirements for employee benefit plan procedures pertaining to claims for

4  benefits by participants and beneficiaries."  29 U.S.C. § 1135 merely authorizes the

5  promulgation of regulations to implement ERISA, while § 1133 identifies the minimum claim

6  procedures, including notices of denials and opportunity for an appeal of adverse decisions.

7  While § 2560.503-1 does impose requirements on plans with regard to claim procedures,

8  nothing in the statutory or regulatory scheme suggests that an ERISA claimant may bring

9  an action for civil penalties under § 1132(c) for a plan's failure to comply with those

10  requirements.

11    Indeed, the Third, Sixth, Seventh, and Eighth Circuits have ruled that § 1132(c) may

12  not be used as a basis to impose civil liability for the violation of § 1133, or regulations

13  promulgated thereto.  See Brown v. J.B. Hunt Transp. Servs., Inc., 586 F.3d 1079, 1089

14  (8th Cir. 2009); Wilczynski v. Lumbermens Mut. Cas. Co., 93 F.3d 397, 405-07 (7th Cir.

15  1996); Stuhlreyer v. Armco, Inc., 12 F.3d 75, 79 (6th Cir. 1993); Groves v. Modified Ret.

16  Plan for Hourly Paid Employees of Johns Manville Corp. & Subsidiaries, 803 F.2d 109,

17  116-18 (3d Cir. 1986).

18    Plaintiff argues, however, that under Sgro, an ERISA claimant in the Ninth Circuit is

19  authorized to seek civil penalties under § 1132(c)(2) for a plan's failure to provide "relevant"

20  information concerning his denied benefits claim.  Plaintiff is reading too much into Sgro.  In

21  that case, the plaintiff sued both the plan administrator (his employer) and the claims

22  administrator (the insurer).  He sought civil penalties under § 1132(c), alleging that he had

23  asked "defendants" for a "complete copy of [his] claim file," and that "defendants" had not

24  complied with the request.  Sgro, 532 F.3d at 944-45.  The district court dismissed the

25  complaint for failure to state a claim.

26    On appeal, the Ninth Circuit concluded the claim was properly dismissed because

27  plaintiff had not specified which defendant he had directed the request to, and the proper

28  party could only be the plan administrator.  Id. at 945.  The court added that "it seems

United States District Court

For the Northern District of California

1    possible for [plaintiff] to amend his complaint to state a claim against [the administrator],"

2    noting that under § 2560.503-1, "[a]dministrators must now turn over, on request, the

3    documents 'generated in the course of making the benefit determination." Id. The court

4    then suggested that where a third party makes the benefit determination, the plan

5    administrator "may not have the needed documents on hand, so it will have to get them

6    from the third party." Id.

7         This court is not persuaded that this suggestion – which was not essential to the

8    holding of the case – supports plaintiff's position. Nevertheless, even if the court assumes

9    that a plan administrator can be liable under 1132(c)(2) for civil penalties for failing to

10   provide documents as defined under the regulation promulgated pursuant to § 1133, the

11   court finds that in this case, penalties are not warranted.

12        The imposition of penalties for failing to provide documents requested by a

13   participant or beneficiary, is left to the discretion of the district court. McDonald v. Pension

14   Plan of NYSA–ILA Pension Tr. Fund, 320 F.3d 151, 163 (2nd Cir. 2003); Paris v. F. Korbel

15   & Bros., 751 F.Supp. 834, 839 (N.D. Cal. 1990). Whether a penalty should be imposed

16   depends upon the administrator's bad faith or intentional conduct, the length of the delay,

17   the number of requests made, and the extent and importance of the documents withheld,

18   and the existence of any prejudice to the participant or beneficiary. See McDonald, 320

19   F.3d at 163; Romero v. SmithKline Beecham, 309 F.3d 113, 120 (3d Cir. 2002).[6]

20        Where there has been no prejudice to the claimant, and where the plan

21   administrator has acted promptly to provide information that it was able to provide, courts

22

23   _____

24   [6] Most courts that have considered the role of prejudice or damages in the inquiry have
concluded that while they are factors that the court may consider, neither is necessary to the
determination under § 502(c)(1). See Mondry v. American Family Mut. Ins. Co., 557 F.3d 781,

25   806 (7th Cir. 2009); Brown v. Aventis Pharma., Inc., 341 F.3d 822, 825 (8th Cir. 2003);
Bannistor v. Ullman, 287 F.3d 394, 407 (5th Cir. 2002); Yoon v. Fordham Univ. Faculty &

26   Admin. Ret. Plan, 263 F.3d 196, 204 n. 11 (2d Cir. 2001); Faircloth v. Lundy Packing Co., 91
F.3d 648, 659 (4th Cir. 1996); Moothart v. Bell, 21 F.3d 1499, 1506 (10th Cir. 1994); but see

27   Byars v. Coca-Cola Co., 517 F.3d 1256, 1271 (11th Cir. 2008) ("While a district court may not
deny penalties solely on the basis of a lack of prejudice, prejudice is a factor that a court

28   should consider in exercising its discretion.").

United States District Court

For the Northern District of California

1   have consistently declined to assess penalties.  See, e.g., Byars, 517 F.3d at 1270

2   (penalties not warranted because, among other things, employer believed in good faith that

3   plaintiff already had requested documents, and plaintiff was not prejudiced); Moore v.

4   LaFayette Life Ins. Co., 458 F.3d 416, 437 (6th Cir. 2006) (penalties not warranted where

5   plaintiff had not demonstrated prejudice due to employer's failure to provide summary plan

6   description); Kaiser Permanente Employees Pension Plan v. Bertozzi, 849 F.Supp. 692,

7   702 (N.D. Cal. 1996) (penalties not warranted because defendant did not act in bad faith

8   and defendant's ERISA violation did not prejudice plaintiff).

9        In this case, plaintiff cannot show that she was prejudiced, as she had already been

10  provided with a complete copy of the administrative record of her LTD claim denial by

11  MetLife.  Moreover, she has made no showing of bad faith by BofA Program, which acted

12  promptly to provide plaintiff with all the Plan documents, and did not hide the existence or

13  location of the administrative record from plaintiff.  BofA Program provided all documents

14  within its possession, and displayed no intent to keep documents away from plaintiff.

15       Even if Sgro can be read to hold that a plan administrator may be liable for penalties

16  for failing to provide non-plan documentation that it would have to get from third parties,

17  plaintiff here had already accomplished the only thing that Sgro arguably requires a plan

18  administrator to do – get the documents from a third party – as she had already obtained

19  the administrative record of her LTD claim from MetLife.

20                              **CONCLUSION**

21       In accordance with the foregoing, the court GRANTS defendants' motion and

22  DENIES plaintiff's motion.

23

24  **IT IS SO ORDERED.**

25  Dated:  March 15, 2011

26                              _____
                                PHYLLIS J. HAMILTON
                                United States District Judge

27

28

                                35